Charles W. and Ruth M. Tobey v. Commissioner.
Tobey v. Commissioner
Docket No. 91392.
United States Tax Court
T.C. Memo 1963-228; 1963 Tax Ct. Memo LEXIS 115; 22 T.C.M. (CCH) 1157; T.C.M. (RIA) 63228; August 26, 1963
*115 Held, that the loss sustained by petitioner from the worthlessness of a debt arising from advances to a corporation of which he was an officer and a stockholder constituted a loss from a nonbusiness bad debt, deductible only to the limited extent provided for short-term capital losses. Whipple v. Commissioner, U.S. , (May 13, 1963) followed. Kenneth F. Kane for the petitioners. Harold C. Arcaro for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined a deficiency in the petitioners' income taxes for the taxable calendar year 1957 in the amount of $1,031.54. The sole question for decision is whether the petitioners are entitled under section 166(a) of the 1954 Code to a business bad debt *116 deduction of $24,444.27 for the year 1957, arising out of unrepaid advances to, and payments of obligations for, a corporation of which the principal petitioner was an officer and shareholder. Findings of Fact Some of the facts were stipulated. The stipulation of facts, together with the exhibits therein identified, is incorporated herein by reference. The petitioners, Charles W. Tobey and Ruth M. Tobey, are husband and wife, having their residence near Concord, New Hampshire. They filed a joint Federal income tax return for the calendar year 1957 here involved, with the district director of internal revenue for New Hampshire at Portsmouth. Ruth Tobey is involved in this case solely because she joined in filing the joint return with her husband. The term "petitioner," in the singular, as used hereinafter, will have reference to Charles Tobey. In 1941, petitioner was licensed to practice as an attorney at law in the State of New Hampshire; and he has, ever since that time, practiced his profession at Concord. For a portion of the time, he practiced by himself; and during other times he was a member of a two-man law partnership composed of himself and another attorney, Atlee *117 Zellers. In about 1947, petitioner was advised by his physician that he was suffering from cancer of the lymph gland; and he was told that he had only about 2 years to live. At the time, petitioner was married and the father of two small children. His law practice was then small, and was not yielding him an income more than sufficient to care for his family. He became concerned that, if he became hospitalized for a prolonged period as the result of the cancerous condition, his family would have no means of support; and that if the cancer proved fatal, the family would be left destitute. Petitioner then resolved to explore every possibility of forming businesses of a commercial and nonlegal nature, so that he might not only derive income currently from such businesses, but also so that if he were hospitalized the businesses might still pay him salaries, and if he should die that he would be able to pass his interests therein to his family. Contrary to the prognosis of his physician, petitioner was cured of his cancer; and he was still alive and in good health at the time of the trial of this case. In 1948, petitioner organized and became the owner of one-third of the capital stock *118 of a corporation known as Sno-Cat Corporation of New Hampshire. Petitioner received his shares of stock in payment for his services in organizing the corporation; and he did not at any time invest any money in the Sno-Cat corporation. The business of the Sno-Cat corporation was the sale of the Tucker Sno-Cat, a heavy piece of tractor-like equipment, used principally for carrying people and equipment over snow-covered ground. It is also used widely by ski resorts in New Hampshire and other eastern localities for packing down the snow on ski trails. In the years immediately following the formation of the corporation, petitioner traveled extensively throughout New England in attempts to promote the use of the Sno-Cat, and in doing so incurred and paid, out of his own funds, the expenses of traveling in such promotion efforts. The only money which petitioner received for his services on behalf of the corporation was a legal fee of $1,000. By 1957 the business of the Sno-Cat corporation had become highly profitable; and in 1958 (subsequent to the taxable year involved) petitioner formed a second corporation, Eastern Distributors, Inc., to purchase the Sno-Cat corporation. Petitioner *119 was the sole stockholder of Eastern Distributors until 1961, when he sold a small portion of his stock herein to another party. Petitioner receives a salary of $30,000 per year as manager of Eastern Distributors. Also in 1948, petitioner became trustee and general counsel of a nonprofit corporation named the "Lincoln Foundation," which was and is engaged in medical research and testing. The foundation derived its name from Robert Lincoln, the inventor of a medicinal preparation called "Staphage" used in the treatment of staphy-lococcus infection. Lincoln had treated petitioner's cancer with this preparation. Out of a desire to further use of Staphage, and for the purpose also of making money for himself, petitioner became trustee and general counsel of the foundation, as heretofore stated. In these capacities, petitioner has traveled extensively over the country in behalf of the foundation, for such purposes as securing patents, licensing manufacturers to use the patents, and raising money for the carrying on of the foundation's work. Petitioner has an agreement whereby he will be a trustee for as long as he lives. He receives a salary in each year in which the foundation is financially *120 able to pay. During 1949 petitioner was approached by an individual named Haug who had designed two devices: (1) A motorized snow plow (not to be confused with the Sno-Cat above mentioned); and (2) an automatic bobbin stripper. Petitioner and his law partner, as "attorneys," entered into agreement with Haug, as "inventor," under which joint ventures were formed for securing patents on the devices and licensing manufacturers for the sale and distribution thereof. Petitioner and his law partner were to receive an assignment of any patents that might be issued, as well as 40 percent of any profits arising out of the ventures. Petitioner visited companies in New Hampshire and Massachusetts seeking to have them manufacture the snow plow and the bobbin stripper; but the companies were not interested. In 1951, petitioner and his law partner entered into another agreement with Haug similar to those just mentioned, creating a joint venture for securing patents and licensing manufacturers of a portable brush cutter invented by Haug. This venture likewise was unsuccessful, despite petitioner's efforts to promote the manufacture and distribution of the brush cutter, and to secure a patent *121 covering the same. No patents were ever received on the Haug inventions; and petitioner realized no income from his and his partner's joint ventures with Haug. In 1950 petitioner formed a partnership with an individual named Roger Lambert, who was a songwriter. Petitioner's duties as a member of the partnership were to secure copyrights on songs written by Lambert and to interest recording companies in having artists make phonograph records of songs. Petitioner, at his own expense, made an unspecified number of trips to Washington, D.C., and New York City on work in behalf of the partnership. The partnership was not successful and it was terminated in 1950. Petitioner realized no profits as a member of the partnership. On April 1, 1953, petitioner handled the organization of a New Hampshire corporation, Neo-Lite Glow Wagon, Inc. (the corporation's name was changed in 1956 to "Mobile Advertising, Inc." and it is here-inafter referred to as "Mobile"). It is the advances later made to this corporation that are involved in the instant case. The incorporators were petitioner, and two other individuals, John A. Yagjian and Marjorie M. Jones. The original capital stock of Mobile was *122 101 shares of no-par-value common, all of which were issued initially to Yagjian under an agreement whereby he was to (and did on the same day) transfer 50 shares to petitioner and 1 share to Jones (who was apparently petitioner's legal secretary). The initial capital contribution to the corporation consisted solely of the following items of personal property all contributed by Yagjian: A 1947 2-ton truck, a steel handbending brake, a 3-foot roller, and a beading machine. These items were taken by Mobile subject to chattel mortgages thereon, totaling $219. Yagjian was president of Mobile, and petitioner was vice president, treasurer, and clerk. It was the understanding of petitioner and Yagjian that petitioner would advance whatever funds were necessary for the corporation's operations. Mobile had been organized for the purpose of constructing and operating a unique type of advertising medium - a truck with a specially designed body having on the side panels flashing neon signs, giving somewhat the appearance of a moving electric billboard. To complete the finished product (hereinafter sometimes called the "glow wagon") it was necessary to rent a building and to purchase a considerable *123 number of power tools. In accordance with the understanding between petitioner and Yagjian, petitioner began making advances of cash to the corporation shortly after its organization; and his initial advances (in an amount not shown by the record) were made to obtain the building and the power tools above mentioned. It had been originally estimated that $2,000 would be required to equip the glow wagon; but the cost of equipping it turned out to be much greater. After the initial construction, it was found to be defective; and it was necessary that it be completely redesigned and rebuilt. Most, if not all, of the costs in equipping the glow wagon were defrayed by means of petitioner's advances to the corporation directly, or by his payment to suppliers of the corporation who had granted credit on the strength of petitioner's assurances that they would be paid. By October 1956, petitioner had advanced to or on behalf of Mobile, the amount of $22,845.11; and on that date Mobile issued its promissory note to petitioner and his wife in that amount, payable on demand and bearing interest at the rate of 6 percent per annum. Subsequently, at intervals during the remaining months of 1956 *124 and during the first 11 months of 1957, petitioner advanced further amounts to or on behalf of Mobile in the total amount of $1,599.16, making the aggregate advances made by petitioner to Mobile $24,444.27. On December 1, 1957, Mobile ceased operations entirely; and during the following year, it was dissolved by act of the legislature of New Hampshire. The only money ever received by petitioner from Mobile was salary of $200 for a 2-week period, at a time not shown by the record. Mobile did not repay any of the advances made to it, or on its behalf, by petitioner. Petitioner on his return for 1957 deducted $24,444.27 as a worthless debt. Said deduction was taken on Schedule C (Profit (or Loss) from Business or Profession) of the return, wherein petitioner described his principal business activity as that of being a lawyer. Respondent, on audit of the return, disallowed the claimed bad debt deduction; and he stated in his statutory notice of deficiency: It has been determined that the claimed business bad debt deduction of $24,444.27 is disallowed because you have not established that you are entitled to such deduction. The respondent further determined that said amount disallowed *125 as a business bad debt was allowable as a short-term capital loss. Opinion The respondent concedes in his brief that "any advances made by the petitioner to Mobile became worthless in the taxable year 1957." We are satisfied that petitioner's advances to Mobile actually aggregated $24,444.27, as he claims they did. The respondent contends, however, that petitioner is not entitled to a business bad debt deduction therefor, on the grounds: (1) That such advances constituted capital contributions; and (2) if they constituted loans, then they gave rise to a nonbusiness bad debt. As we view the case, especially in the light of the recent decision of the Supreme Court in Whipple v. Commissioner, U.S. , (May 13, 1963), it is unnecessary for us to consider and decide the first contention - that the advances constituted capital contributions. For, assuming that the advances constituted loans, the inescapable result of applying the rule in the Whipple case to the facts of the instant case is that the worthless debt here involved must be classified as a nonbusiness bad debt, deductible only to the limited extent provided for short-term capital losses. Thus, the tax result in the instant *126 case will be the same, whether the advances be considered capital contributions or loans giving rise to nonbusiness bad debts. Petitioner has pitched his entire case upon the theory that he was in a trade or business of organizing business enterprises, and that the loss sustained by him as the result of his advances to one of such enterprises (Mobile) not being repaid, was proximately related to his alleged business at the time the resultant debt became worthless. Petitioner places principal reliance on such cases as , and , reversing a Memorandum Opinion of this Court. In the Whipple case, supra, the taxpayer had organized a number of corporations and had made advances to or on behalf of one of the corporations, which the said corporation was unable to repay. The taxpayer sought to deduct the amount of unrepaid advances as a business bad debt, asserting that he was in the business of promoting, managing, or financing corporations. The Supreme Court (affirming both the Court of , and this ) *127 held that the taxpayer was not entitled to the claimed business bad debt deduction. The Supreme Court stated in part: If full-time service to one corporation does not alone amount to a trade or business, which it does not, it is difficult to understand how the same service to many corporations would suffice. To be sure, the presence of more than one corporation might lend support to a finding that the taxpayer was engaged in a regular course of promoting corporations for a fee or commission, see Ballantine, Corporations (rev. ed. 1946), 102, or for a profit on their sale, see (C.A. 5th Cir.), but in such cases there is compensation other than the normal investor's return, income received directly for his own services rather than indirectly through the corporate enterprise and the principles of Burnet, Dalton, DuPont and Higgins are therefore not offended. On the other hand, since the Tax Court found, and the petitioner does not dispute, that there was no intention here of developing the corporations as going businesses for sale to customers in the ordinary course, the case before us inexorably rests upon the claim that one who actively *128 engages in serving his own corporations for the purpose of creating future income through those enterprises is in a trade or business. That argument is untenable in light of Burnet, Dalton, DuPont and Higgins, and we reject it. [10] Absent substantial additional evidence, [n11] furnishing management and other services to corporations for a reward no different than that flowing to an investor in those corporations is not a trade or business under § 23(k)(4). We are, therefore, fully in agreement with this aspect of the decision below. [Footnote 11 omitted.] The plain teaching emerging from the foregoing is, that in order to prevail in the instant case, petitioner must show that he intended to develop the business enterprises in which he engaged, as going businesses for sale to customers in the ordinary course. But, petitioner does not even claim to have had such an intention; and indeed such an intention is squarely contrary to the very *129 reasons that petitioner went into all of the enterprises, including Mobile. His continuing aims, far from desiring to sell those business enterprises, were rather to retain them, in order to provide himself with current income while he was engaged in them, to assure a continued salary for himself from them in the event his illness caused him to be hospitalized, and to create an interest in going business enterprises which he could pass on to his family in the event that his illness should prove fatal. The only interest in any of his business enterprises that petitioner ever sold was a small portion of his interest in the Eastern Distributors corporation; and that occurred in 1961,'4 years after the close of the taxable year. We decide the case for the respondent, and hold that he correctly disallowed the business bad debt deduction claimed by petitioner. As we have heretofore found, the respondent did determine that the amount so disallowed was allowable as a short-term capital loss. Decision will be entered for the respondent. Footnotes
10. To the extent that they hold or contain statements to the contrary, we disapprove of such cases as * * * (C.A. 3d Cir.), * * * [and] , * * *↩